B104 (FORM 104) (08/07)                                                                 EDVA

| ADVERSARY PROCEEDING COVER SHEET<br>(Instructions on Reverse) | ADVERSARY PROCEEDING NUMBER<br>(Court Use Only) |
|---|---|

| PLAINTIFFS | DEFENDANTS |
|---|---|
| H. Jason Gold, Chapter 11 Trustee | Khuram Shah and Shehraze Shah |

| ATTORNEYS (Firm Name, Address, and Telephone No.)<br>Christopher A. Jones - 703.280.9260<br>Whiteford Taylor Preston, LLP<br>3190 Fairview Park Dr., Ste. 300, Falls Church, VA 22042 | ATTORNEYS (If Known) |
|---|---|

| PARTY (Check One Box Only)<br>□ Debtor  □ U.S. Trustee/Bankruptcy Admin<br>□ Creditor  □ Other<br>☒ Trustee | PARTY (Check One Box Only)<br>□ Debtor  □ U.S. Trustee/Bankruptcy Admin<br>☒ Creditor  □ Other<br>□ Trustee |
|---|---|

**CAUSE OF ACTION** (WRITE A BRIEF STATEMENT OF CAUSE OF ACTION, INCLUDING ALL U.S. STATUTES INVOLVED)

Complaint to recover preferences and/or fraudulent transfers. 11 U.S.C. Secs. 544, 547, 548 and/or 550; Va. Code Secs. 55-80, 55-81, and/or 55-82.

## NATURE OF SUIT

(Number up to five (5) boxes starting with lead cause of action as 1, first alternative cause as 2, second alternative cause as 3, etc.)

**FRBP 7001(1) – Recovery of Money/Property**
- ☐ 11-Recovery of money/property - §542 turnover of property
- ☑ 12-Recovery of money/property - §547 preference
- ☑ 13-Recovery of money/property - §548 fraudulent transfer
- ☑ 14-Recovery of money/property - other

**FRBP 7001(2) – Validity, Priority or Extent of Lien**
- ☐ 21-Validity, priority or extent of lien or other interest in property

**FRBP 7001(3) – Approval of Sale of Property**
- ☐ 31-Approval of sale of property of estate and of a co-owner - §363(h)

**FRBP 7001(4) – Objection/Revocation of Discharge**
- ☐ 41-Objection / revocation of discharge - §727(c),(d),(e)

**FRBP 7001(5) – Revocation of Confirmation**
- ☐ 51-Revocation of confirmation

**FRBP 7001(6) – Dischargeability**
- ☐ 66-Dischargeability - §523(a)(1),(14),(14A) priority tax claims
- ☐ 62-Dischargeability - §523(a)(2), false pretenses, false representation, actual fraud
- ☐ 67-Dischargeability - §523(a)(4), fraud as fiduciary, embezzlement, larceny

(continued next column)

**FRBP 7001(6) – Dischargeability (continued)**
- ☐ 61-Dischargeability - §523(a)(5), domestic support
- ☐ 68-Dischargeability - §523(a)(6), willful and malicious injury
- ☐ 63-Dischargeability - §523(a)(8), student loan
- ☐ 64-Dischargeability - §523(a)(15), divorce or separation obligation (other than domestic support)
- ☐ 65-Dischargeability - other

**FRBP 7001(7) – Injunctive Relief**
- ☐ 71-Injunctive relief – imposition of stay
- ☐ 72-Injunctive relief – other

**FRBP 7001(8) Subordination of Claim or Interest**
- ☐ 81-Subordination of claim or interest

**FRBP 7001(9) Declaratory Judgment**
- ☐ 91-Declaratory judgment

**FRBP 7001(10) Determination of Removed Action**
- ☐ 01-Determination of removed claim or cause

**Other**
- ☐ SS-SIPA Case – 15 U.S.C. §§78aaa *et.seq.*
- ☐ 02-Other (e.g. other actions that would have been brought in state court if unrelated to bankruptcy case)

| ☒ Check if this case involves a substantive issue of state law | □ Check if this is asserted to be a class action under FRCP 23 |
|---|---|
| □ Check if a jury trial is demanded in complaint | Demand $ 1,781,956.45 |

**Other Relief Sought**

B104 (FORM 104) (08/07), Page 2

| BANKRUPTCY CASE IN WHICH THIS ADVERSARY PROCEEDING ARISES | | |
|---|---|---|
| NAME OF DEBTOR<br>Vijay K. Taneja | BANKRUPTCY CASE NO.<br>08-13293 | |
| DISTRICT IN WHICH CASE IS PENDING<br>Eastern District of Virginia | DIVISION OFFICE<br>Alexandria | NAME OF JUDGE<br>Stephen S. Mitchell |
| RELATED ADVERSARY PROCEEDING (IF ANY) | | |
| PLAINTIFF | DEFENDANT | ADVERSARY<br>PROCEEDING NO. |
| DISTRICT IN WHICH ADVERSARY IS PENDING | DIVISION OFFICE | NAME OF JUDGE |
| SIGNATURE OF ATTORNEY (OR PLAINTIFF)<br><br>/s/ Christopher A. Jones | | |
| DATE<br><br>June 8, 2010 | PRINT NAME OF ATTORNEY (OR PLAINTIFF)<br><br>Christopher A. Jones | |

## INSTRUCTIONS

The filing of a bankruptcy case creates an "estate" under the jurisdiction of the bankruptcy court which consists of all of the property of the debtor, wherever that property is located. Because the bankruptcy estate is so extensive and the jurisdiction of the court so broad, there may be lawsuits over the property or property rights of the estate. There also may be lawsuits concerning the debtor's discharge. If such a lawsuit is filed in a bankruptcy court, it is called an adversary proceeding.

A party filing an adversary proceeding must also complete and file Form 104, the Adversary Proceeding Cover Sheet, *unless the party files the adversary proceeding electronically through the court's Case Management/Electronic Case Filing system (CM/ECF). (CM/ECF captures the information on Form 104 as part of the filing process.) When completed, the cover sheet summarizes basic information on the adversary proceeding. The clerk of court needs the information to process the adversary proceeding and prepare required statistical reports on court activity.

The cover sheet and the information contained on it do not replace or supplement the filing and service of pleadings or other papers as required by law, the Bankruptcy Rules, or the local rules of court. The cover sheet, which is largely self-explanatory, must be completed by the plaintiff's attorney (or by the plaintiff if the plaintiff is not represented by an attorney). A separate cover sheet must be submitted to the clerk for each complaint filed.

**Plaintiffs** and **Defendants.** Give the names of the plaintiffs and defendants exactly as they appear on the complaint.

**Attorneys.** Give the names and addresses of the attorneys, if known.

**Party.** Check the most appropriate box in the first column for the plaintiffs and the second column for the defendants.

**Demand.** Enter the dollar amount being demanded in the complaint.

**Signature.** This cover sheet must be signed by the attorney of record in the box on the second page of the form. If the plaintiff is represented by a law firm, a member of the firm must sign. If the plaintiff is pro se, that is, not represented by an attorney, the plaintiff must sign.

*Per LBR 7003-1, in the EDVA, a properly completed Adversary Proceeding Cover Sheet is required.

## UNITED STATES BANKRUPTCY COURT
## EASTERN DISTRICT OF VIRGINIA
### (Alexandria Division)

| | | |
|---|---|---|
| In re: | * | |
| VIJAY K. TANEJA, *et al.*,[1] | * | Case No:  08-13293-SSM |
| | | Chapter 11 |
| Debtors, | * | Jointly Administered |
| * * * * * | * | * * * * * |
| H. JASON GOLD, Chapter 11 Trustee | * | |
| Plaintiff, | * | |
| | | Adv. Proc. No. 10-_____ |
| v. | * | |
| SHEHRAZE SHAH | * | |
| and | | |
| KHURAM SHAH | | |
| Defendants. | * | |

* * * * * * * * * * * * * *

## COMPLAINT TO AVOID TRANSFERS AND TO RECOVER PROPERTY AND FOR RELATED RELIEF

H. Jason Gold, the Chapter 11 Trustee for the estates of the above-captioned debtors (the "Debtors"), by undersigned counsel, files this Complaint to Avoid Transfers and to Recover Property and for Related Relief pursuant to 11 U.S.C. §§ 502, 544, 547, 548, and 550, and Virginia Code Ann. §§ 55-80, 55-81 and 55-82 against Shehraze Shah and Khuram Shah (the "Shahs" or the "Defendants") and for cause states as follows:

---

[1] The Debtors in these jointly administered cases include Elite Entertainment, Inc. (08-13286-SSM), Financial Mortgage, Inc. (08-13287-SSM), NRM Investments, Inc. (08-13290-SSM), Taneja Center, Inc. (08-13292-SSM), and Vijay K. Taneja (08-13293-SSM).

WHITEFORD, TAYLOR & PRESTON, LLP
Bradford F. Englander (VSB# 36221)
Christopher A. Jones (VSB # 40064)
3190 Fairview Park Drive, Suite 300
Falls Church, Virginia 22042
(703) 280-9260
(703) 280-8942 (facsimile)

*Special Counsel for H. Jason Gold, Chapter 11 Trustee*

## JURISDICTION

1.      This Court has jurisdiction over this adversary proceeding pursuant to 28 U.S.C. §§ 157 and 1334.

2.      Venue lies properly in this Court pursuant to 28 U.S.C. § 1409.

3.      This matter is a core proceeding pursuant to 28 U.S.C. § 157.

## THE PARTIES

4.      On June 9, 2008 (the "Petition Date"), Vijay Taneja ("Taneja"), and his corporate affiliates, Financial Mortgage, Inc. ("FMI"), Taneja Center, Inc. ("TCI"), NRM Investments, Inc. ("NRM"), and Elite Entertainment, Inc. ("Elite" and together with FMI, TCI and NRM, the "Companies"), filed voluntary petitions for relief under chapter 11 of title 11 of the United States Code (the "Bankruptcy Code") in the United States Bankruptcy Court for the Eastern District of Virginia (the "Bankruptcy Court"), Nos. 08-13293-SSM, 08-13287-SSM, 08-13292-SSM, 08-13290-SSM and 08-13286-SSM, respectively.  Taneja and the Companies are hereinafter referred to as the "Debtors."

5.      The Plaintiff, H. Jason Gold, a resident of Virginia, was appointed as the Chapter 11 Trustee for all of the Debtors (the "Trustee").

6.      Shehraze Shah is a person as defined in 11 U.S.C. § 101(41), residing and/or conducting business in the United States.

7.      Khuram Shah is a person as defined in 11 U.S.C. § 101(41), residing and/or conducting business in the United States.

## FACTUAL BACKGROUND

### The Debtors

8.     FMI was a Virginia corporation owned by Taneja that originated residential home mortgages in Virginia and other states.

9.     NRM was a Virginia corporation owned by Taneja that primarily engaged in residential real estate development.

10.    TCI was a Virginia corporation owned by Taneja that engaged in commercial real estate development.

11.    Elite was a Virginia corporation owned by Taneja that engaged in promotional and entertainment events involving the "Bollywood" music and film industry, including promoting concerts and producing a movie in a joint venture with a Bollywood movie star.

12.    Taneja was, at the relevant times leading up to the Petition Date, the President and Director of the Companies, but at the time of the Petition Date, Taneja was not an officer of the Companies.

### The Business of FMI

13.    To facilitate its home mortgage business, FMI maintained a warehouse line of credit with one or more financial institutions that would advance funds so that FMI could originate mortgages. In exchange for providing access to funds, the warehouse lender would typically charge fees and interest on the amounts loaned to FMI. Because the interest margin on warehouse loans generally is low, and corresponding fees are nominal, the warehouse lender's profits are driven by volume of loans financed through their credit facility.

3

14.    Typically, within a specified time of the closing on a loan, FMI was required to sell the note and corresponding mortgage it originated to a third-party investor in the secondary mortgage market called an "end investor" or secondary market purchaser ("SMP").

15.    After acquiring a loan, certain SMPs routinely assigned the loans to a trust or other entity that would hold the loans as collateral for mortgage backed securities issued to the public.

16.    As a matter of course and industry practice, those SMPs would make various representations to the trusts and other holders of FMI-originated loans regarding the SMP's supposed due diligence of the loans, which the SMPs knew were material in the issuance of securities and would be relied upon by the investors and trust. These industry-standard representations included: that the seller of the notes to the mortgage pool, *i.e.* SMP, has not advanced funds or induced, solicited, or to their actual knowledge received any advance of funds from a party other than the owner of the related mortgaged property, directly or indirectly, for the payment of any amount required by the note or mortgage, and that the mortgages contained in the pool were not fraudulent. FMI regularly made payments to SMPs from their direct accounts mailed from FMI's address, and FMI's affiliated Debtors also made payments directly to SMPs. Moreover, multiple payments from a single Debtor were made to SMPs to satisfy obligations for separate and distinct notes. As a result, the SMP recipients of those payments from the Debtors accepted the fraudulent payments knowing that the loan originator, or another entity not obligated to make payment on the notes, was making the payment, thereby perpetuating the fraud. This knowledge or willful blindness of the source of payments was in direct

4

contravention to the representations and warranties certain SMPs were required to make to investors and the public.

17.    The SMPs also established very risky loan programs in an effort to increase the volume of loans that they could acquire from FMI and other originators, and subsequently assign to investment trusts.  For example, several SMPs that purchased loans from FMI used an "80-20" program that allowed approval of zero dollar down payment loans with the entire transaction funded by two loans—the first mortgage of eighty percent (80%) and the second mortgage of twenty percent (20%).  The "80-20" loans have been described as one of the chief causes of the nationwide mortgage meltdown.

18.    SMPs routinely made a profit on the FMI-originated loans through fees and interest.

19.    The lack of due diligence on the part of the SMPs was fueled by their insatiable appetite for loans which, in turn, generated the marketplace demand for the perpetuation of FMI's fraud.

20.    Senator Patrick J. Leahy, the Chairman of the Senate Judiciary Committee aptly described the role of the banking institutions and lenders in facilitating the mortgage industry crisis when he said: "We do know that banks and private mortgage companies relaxed their standards for loans and approving ever riskier mortgage [sic], less and less due diligence, that it's almost like opening a door and saying hey, come on in.  Fraud is welcome."  Senate Judiciary Committee Hearing, *The Need for Increased Fraud Enforcement in the Wake of the Economic Downtown* (February 11, 2009).

## The Fraudulent Scheme

21.    In or about 1999, FMI began originating loans that it was unable to sell to SMPs.  This resulted in FMI's inability to repay obligations that it owed to its then-warehouse lender(s).

22.    In 2000, FMI secured a new warehouse lender that financed the origination of loans until they were sold to an SMP.

23.    Because FMI could not pay its obligations as they came due in the ordinary course, Taneja began engaging in fraud no later than 2000 through the Debtors.

24.    As part of the fraudulent business practices, FMI submitted false funding schedules to its warehouse lender(s) seeking advances against FMI's warehouse lines of credit on fraudulent mortgages.

25.    Indeed, Taneja coordinated the transfer of certain properties to multiple different owners over a short period of time so that FMI and Taneja could generate additional fraudulent loan proceeds. Often, Taneja would orchestrate such transfers with the assistance of various friends, employees of FMI and others who acted as nominal buyers and borrowers in order to generate the fraudulent loans.

26.    When the fraudulent funds from the warehouse lenders were received by the title company with whom FMI had a relationship and which was usually involved in the fraud, virtually all of the funds were diverted to FMI instead of clearing title or paying off pre-existing mortgages.

27.    The process of submitting fraudulent loan documentation to warehouse lenders continued for the purpose of obtaining additional advances of cash that could be used to pay down the line of credit for the previously-submitted fraudulent loans, many

of which had to be sold to an investor or otherwise repurchased by FMI within ninety days of their origination, or for payment of personal or other business venture operational expenses.

28.     As a result, Taneja perpetuated the fraud of the Debtors to obtain new fraudulent loan proceeds so that prior fraudulent loans could be paid back and the fraudulent scheme continued.

29.     When one of FMI's warehouse lenders discovered the fraud in late 2001, it terminated its relationship with FMI, leaving an unpaid balance of approximately $3.7 million. FMI eventually paid back this amount through additional fraudulent practices.

30.     Those additional fraudulent practices included the sale by FMI of loans to multiple SMPs each of which was purportedly secured by multiple unrecorded "first" mortgages on the same pieces of real property.

31.     Taneja did not disclose to the SMPs the existence of the other "first" mortgages or the failure of FMI to record the mortgages or cause the mortgages to be recorded.

32.     This scheme was accomplished, in part, by having borrowers sign multiple sets of "original" loan documents. Each loan would then be sold to different SMPs by falsely representing that each loan was the only loan secured by a first mortgage on each property.

33.     In many cases, the SMPs were asked to remit monthly statements for the mortgage loan amounts due to FMI's business so that FMI or one of the other Companies could make the payments on the loans in an effort to avoid discovery of the fraud.

34.    Taneja, through the Debtors, continued the fraudulent selling of multiple mortgage documents because it was necessary for the Debtors to generate new funds to make monthly payments on the fraudulent loans and to buyback fraudulent loans from SMPs since the Debtors had insufficient capital to service their debts as they came due. Indeed, in some circumstances, a Debtor only paid the interest owed on the fraudulent note such that the principal debt remained, but the cash proceeds of the fraud were depleted.

35.    The fraudulent actions of Taneja and the Companies constituted a Ponzi scheme that started no later than 2000.

### Taneja's Criminal Plea

36.    In late October 2008, the United States Attorney for the Eastern District of Virginia charged Taneja with conspiracy to engage in money laundering and subsequently filed a Criminal Information against Taneja.  On November 13, 2008, Taneja pled guilty to one count of conspiracy to commit money laundering in violation of 18 U.S.C. § 1956(h).

37.    In doing so, Taneja admitted the facts underlying the Plea Agreement that are contained in the Statement of Facts filed with the Plea Agreement on November 13, 2008.

38.    Taneja was sentenced to 84 months in prison and ordered to pay restitution in the amount of $33,162,291.  Upon information and belief, none of the ordered restitution has been paid by Taneja.

## The Transfers

39.     As part of the fraudulent scheme, FMI, NRM, Elite and Taneja (each a "Transferor") made transfers in the form of payments by check or electronic wire and/or debit (the "Transfers") to Khuram Shah, as well as GMAC Bank, Specialized Loan Servicing and Terwin Advisors, LLC for the benefit of the Shahs (excluding the Defendants, collectively, the "Financial Institutions").

40.     The Transfers are set forth on **Exhibits 1, 2, and 3**, which are attached hereto and incorporated herein by reference, and contain transfers made to Khuram Shah and the Financial Institutions within (i) two years of the Petition Date (the "Two-Year Transfers"), (ii) five years of the Petition Date (the "Five-Year Transfers"), and (iii) ninety days of the Petition Date (the "Ninety-Day Transfers"), respectively.

## The Insolvency of the Debtors

41.     From at least 2000, the Debtors were actively involved in perpetuating a Ponzi scheme to defraud lenders, SMPs, and borrowers.

42.     The fraudulent practices continued for the purpose of obtaining additional advances of cash needed to: (i) pay down the obligations incurred from prior fraudulent receipts; (ii) fund business operations of the Debtors as well as non-debtor affiliates; and (iii) finance Taneja's extravagant lifestyle.

43.     Indeed, the Debtors had to continue the fraud because they were unable to "dig out" from obligations resulting from prior fraudulent transactions.  Thus, as in a typical Ponzi scheme, the Debtors found new fraud victims to generate cash to pay off older debts obtained through their prior frauds.

44.     Moreover, when either a warehouse lender or SMP questioned the practices of the Debtors, one of the Debtors made payments to such warehouse lender and/or SMP to keep them from revealing the fraud.  As a result, the Debtors became more insolvent and continually were required to originate new fraudulent notes to fund such payoffs and perpetuate the Ponzi scheme.

45.     As a result of the Ponzi scheme, which began as early as 2000 when Taneja submitted fraudulent loan applications to its then-warehouse lender(s), the Debtors became insolvent prior to the five-year period preceding the Petition Date and remained insolvent at all times thereafter.

46.     Further, based on the Companies' financial records and third party financial documents, the value of FMI's assets at a fair valuation from April 30, 2003 through the Petition Date was less than FMI's current and long-term debts during the same time period.  Accordingly, at all times relevant to the causes of action alleged herein, FMI was insolvent.

47.     Based on Taneja's financial records, the records of the Companies, and third party financial documents, the value of Taneja's assets at a fair valuation from June 8, 2003 through the Petition Date was less than Taneja's current and long term debts during the same period.  Accordingly, at all times relevant to the causes of action alleged herein, Taneja was insolvent.

48.     Based on the Companies' financial records and third party financial documents, the value of NRM's assets at a fair valuation from June 8, 2003 through the Petition Date was less than NRM's current and long term debts during the same period.

Accordingly, at all times relevant to the causes of action alleged herein, NRM was insolvent. Moreover, NRM was never profitable.

49.     Based on the Companies' financial records and third party financial documents, the value of TCI's assets at a fair valuation on January 2005 through the Petition Date was less than TCI's current and long term debts during the same period. Accordingly, at all times relevant to the causes of action alleged herein, TCI was insolvent. Moreover, TCI was never profitable.

50.     Based on the Companies' financial records and third party financial documents, the value of Elite's assets at a fair valuation on June 8, 2003 through the Petition Date was less than Elite's current and long term debts during that same period. Accordingly, at all times relevant to the causes of action alleged herein, Elite was insolvent. Moreover, Elite was never profitable.

## COUNT I
### (Avoidance and Recovery of Fraudulent Transfers
### Pursuant to 11 U.S.C. §§ 548(a)(1)(A) and 550)

51.     Plaintiff incorporates by reference, as if fully restated herein, the preceding allegations contained in paragraphs 1 to 50 of the Complaint.

52.     The Two-Year Transfers were transfers of the interest in property of the applicable debtor Transferor as indicated on **Exhibit 1**.

53.     The Two-Year Transfers were made Khuram Shah directly in the amount of $100,000.00 and for the benefit of the Shahs jointly and severally in the amount of $1,781,956.45 by the applicable debtor Transferor as set forth on **Exhibit 1** with the actual intent of the debtor Transferor to hinder, defraud or delay existing and/or subsequent creditors of the debtor Transferor.

54.     As set forth above, the Transfers were part of an ongoing Ponzi scheme that was perpetuated by the financial dealings of the Debtors.  All payments by or on behalf of the Debtors, including the Transfers, were made to or for the benefit of the Defendants to maintain the Ponzi scheme.  The Transfers were made with respect to a fraudulent loan for the purpose of hindering or delaying the discovery of the fraud conducted by the Debtors.

55.     The Two-Year Transfers are avoidable transfers pursuant to 11 U.S.C. § 548(a)(1)(A).

56.     Khuram Shah is the initial transferee of the Two-Year Transfers in the amount of $100,000.00 and the Shahs are the persons who benefited from the remaining Two-Year Transfers in the amount of $1,781,956.45, as indicated on **Exhibit 1**.

57.     The Two-Year Transfers are recoverable from Khuram Shah in the amount of $100,000.00 as the initial transferee of the debtor Transferor's property and from the Shahs, jointly and severally, as the persons for whose benefit the Two-Year Transfers in the amount of $1,781,956.45were made pursuant to 11 U.S.C. § 550 of the Bankruptcy Code.

**WHEREFORE**, Plaintiff requests that judgment be entered,

a.     Avoiding the Two-Year Transfers as fraudulent transfers pursuant to 11 U.S.C. § 548(a)(1)(A).

b.     Granting judgment against (i) Khuram Shah in the amount of not less than $100,000.00, plus attorneys' fees and costs and (ii) Khuram and Shehraze Shah, jointly severally, in the amount of not less than $1,781,956.45, plus attorneys' fees and costs.

## COUNT II
### (Avoidance and Recovery of Fraudulent Transfers
### Pursuant to 11 U.S.C. §§ 548(a)(1)(B) and 550)

58.     Plaintiff incorporates by reference, as if fully stated herein, the preceding allegations of paragraphs 1 to 50 of the Complaint.

59.     The Two-Year Transfers were transfers of the interest in property of the applicable debtor Transferor as indicated on **Exhibit 1**.

60.     In exchange for the Two-Year Transfers, as set forth on **Exhibit 1**, the applicable debtor Transferor received less than reasonably equivalent value because the applicable debtor Transferor had no obligation to make the Transfers to Khuram Shah or the Financial Institutions on behalf of Defendants and did not receive any value from making the Two-Year Transfers to Khuram Shah or the Financial Institutions for the benefit of the Defendants.

61.     During the two-year period preceding the Petition Date, the Companies and Taneja were insolvent as set forth above.

62.     Additionally, the Debtors were engaged in business that had unreasonably small capital, which remained unreasonably small following each of the Two-Year Transfers because all of the Debtors had insufficient cash to make payment on current obligations.  Indeed, the Debtors had to obtain additional cash to support their operations from new fraudulent loans.

63.     Further, when making each of the Two-Year Transfers, the applicable debtor Transferor intended to incur, or believed it would incur, debts that would be beyond its ability to pay as such debts matured because it knew it has insufficient funds

to pay its debts and that its obligations resulting from its fraud prevented it from paying debts as they matured.

64.     The Two-Year Transfers are avoidable transfers pursuant to 11 U.S.C. § 548(a)(1)(B).

65.     Khuram Shah is the initial transferee of the Two-Year Transfers in the amount of $100,000.00 and the Shahs are the persons who benefited from the remaining Two-Year Transfers in the amount of $1,781,956.45, as indicated on **Exhibit 1**.

66.     The Two-Year Transfers are recoverable from Khuram Shah in the amount of $100,000.00 as the initial transferee of the debtor Transferor's property and from the Shahs, jointly and severally, as the persons for whose benefit the Two-Year Transfers were made pursuant to 11 U.S.C. § 550 of the Bankruptcy Code.

**WHEREFORE**, Plaintiff requests that judgment be entered,

a.     Avoiding the Two-Year Transfers as fraudulent transfers pursuant to 11 U.S.C. § 548(a)(1)(B).

b.     Granting judgment against (i) Khuram Shah in the amount of not less than $100,000.00, plus attorneys' fees and costs and (ii) Khuram and Shehraze Shah, jointly severally, in the amount of not less than $1,781,956.45, plus attorneys' fees and costs.

**COUNT III**
**(Avoidance and Recovery of Fraudulent Transfers**
**Pursuant to 11 U.S.C. § 544, Virginia Code Ann. § 55-80)**

67.     Plaintiff incorporates by reference, as if fully restated herein, the preceding allegations of paragraphs 1 to 50 of the Complaint.

68.     The Five-Year Transfers were transfers of the interest in property of the applicable debtor Transferor as indicated on **Exhibit 2**.

69.     The Five-Year Transfers were made to Khuram Shah and the Financial Institutions for the benefit of the Shahs by the applicable debtor Transferor as set forth on **Exhibit 2** with the actual intent of the debtor Transferor to hinder, defraud or delay existing and/or subsequent creditors of the debtor Transferor.

70.     As set forth above, the Transfers were part of an ongoing Ponzi scheme that was perpetuated by the financial dealings of the Debtors.  All payments by or on behalf of the Debtors, including the Transfers, were made to Defendants for the benefit of the Defendants to maintain the Ponzi scheme.  The Transfers were made with respect to a fraudulent loan for the purpose of hindering or delaying the discovery of the fraud conducted by the Debtors.

71.     Pursuant to Virginia Code Ann. § 55-80, and 11 U.S.C. § 544, transfers made with the intent to delay, hinder or defraud creditors are fraudulent as to present and future creditors.

72.     Khuram Shah is the initial transferee of the Five-Year Transfers in the amount of $100,000.00 and the Shahs are the persons for whose benefit the remaining Five-Year Transfers in the amount of $1,947,257.42 were made, as indicated on **Exhibit 2**.

73.     There exists at least one creditor of the applicable debtor Transferor with an allowed unsecured claim in that debtor's bankruptcy case that could avoid the Five-Year Transfers under Virginia Code Ann. § 55-80.

74.     The Five-Year Transfers are recoverable from Khuram Shah as the initial transferee of the debtor Transferor's property pursuant to 11. U.S.C. § 550 and Virginia

Code Ann. § 55-82 and from the Shahs, jointly and severally, in the amount of $1,947,257.42.

**WHEREFORE**, Plaintiff requests that judgment be entered,

a.      Avoiding the Five-Year Transfers as fraudulent transfers pursuant to 11 U.S.C. § 544 and Virginia Code Ann. § 55-80.

b.      Granting judgment against (i) Khuram Shah pursuant to 11 U.S.C. § 550 and Virginia Code Ann. § 55-82 in the amount not less than $100,000.00, plus attorneys' fees and costs, and (ii) Khuram and Shehraze Shah, jointly and severally, in the amount of $1,947,257.42, plus attorneys' fees and costs.

**COUNT IV**
**(Avoidance and Recovery of Constructively Fraudulent Transfers**
**Pursuant to 11 U.S.C. § 544 and Virginia Code Ann. § 55-81)**

75.      Plaintiff incorporates by reference, as if fully restated herein, the preceding allegations of paragraphs 1 to 50 of the Complaint.

76.      The Five-Year Transfers were transfers of the interest in property of the applicable debtor Transferor as indicated on **Exhibit 2**.

77.      In exchange for the Five-Year Transfers set forth on **Exhibit 2**, the applicable debtor Transferor received no consideration deemed valuable in law because the applicable debtor Transferor had no obligation to make the Five-Year Transfers to Khuram Shah or to the Financial Institutions for the benefit of the Shahs and did not receive any value from making the Five-Year Transfers to Khuram Shah or for the benefit of the Defendants.

78.      At the time of the Five-Year Transfers, the Debtors were each insolvent as set forth in detail above.

16

79.     There exists at least one creditor of the applicable debtor Transferor with an allowed unsecured claim in that debtor's bankruptcy case that could avoid the Five-Year Transfers under Virginia Code Ann. § 55-81.

80.     The Five-Year Transfers are avoidable transfers pursuant to 11 U.S.C. § 544 and Virginia Code Ann. § 55-81.

81.     Khuram Shah is the initial transferee of the Five-Year Transfers in the amount of $100,000.00 and the Shahs are the persons who benefited from the Five-Year Transfers in the amount of $1,947,257.42, as indicated on **Exhibit 2**.

82.     The Five-Year Transfers are recoverable from Khuram Shah as the initial transferee of the debtor Transferor's property and from the Shahs, jointly and severally, as the persons who benefited from such Five-Year Transfers pursuant to 11 U.S.C. § 550 and Virginia Code Ann. § 55-82.

**WHEREFORE**, Plaintiff requests that judgment be entered,

a.     Avoiding the Five-Year Transfers as fraudulent transfers pursuant to 11 U.S.C. § 544 and Virginia Code Ann. § 55-81.

b.     Granting judgment against (i) Khuram Shah pursuant to 11 U.S.C. § 550 and Virginia Code Ann. § 55-82 in the amount not less than $100,000.00, plus attorneys' fees and costs, and (ii) Khuram and Shehraze Shah, jointly and severally, in the amount of $1,947,257.42, plus attorneys' fees and costs.

### COUNT V
**(Avoidance and Recovery of the Preferential Transfers**
**Pursuant to 11 U.S.C. §§ 547(b) and 550)**

83.     Plaintiff incorporates by reference, as if fully stated herein, the preceding allegations in paragraphs 1 to 50 of the Complaint.

84.     The Ninety-Day Transfers as set forth on **Exhibit 3**, which is incorporated herein by reference, were transfers of the interest in property of NRM.

85.     To the extent that the Transfers are found to have been given for value in satisfaction of debts of the Debtors, the Ninety-Day Transfers were made to a creditor on account of antecedent debts owed by NRM before each of the Ninety-Day Transfers was made.

86.     The Ninety-Day Transfers were made to SLS for the benefit of the Defendants within ninety (90) days of the Petition Date.

87.     The Ninety-Day Transfers were made for the benefit of the Defendants because cash was transferred to SLS to pay a debt of the Defendants.

88.     NRM was insolvent when the Ninety-Day Transfers were made for the benefit of the Defendants as set forth in detail above.

89.     The amount of claims asserted against NRM far exceeds the assets of NRM's estate such that the Defendants received more from the Ninety-Day Transfers than the Defendants would have received had the Ninety-Day Transfers not been made and if NRM was a debtor in a case under chapter 7 of the Bankruptcy Code.

90.     The Defendants are the persons for whose benefit the Ninety-Day Transfers were made.

91.     The Ninety-Day Transfers are recoverable from the Defendants because they benefited the Defendants pursuant to 11 U.S.C. § 550 of the Bankruptcy Code.

**WHEREFORE**, Plaintiff requests that judgment be entered,

a.      Avoiding the Ninety-Day Transfers as preferential transfers pursuant to 11 U.S.C. § 547.

b.     Granting judgment against the Defendants pursuant to 11 U.S.C. § 550 in the amount not less than $3,494.35, plus attorneys' fees and costs.

### COUNT VI
### (Disallowance of Claim Pursuant to 11 U.S.C. § 502(d))

92.     Plaintiff incorporates by reference, as if fully stated herein, the preceding allegations in paragraphs 1 to 91 of the Complaint.

93.     The Transfers sought in the counts above are avoidable and recoverable as set forth therein pursuant to the applicable Bankruptcy Code sections alleged.

94.     The Defendants have not paid the amount, or turned over the property sought to be avoided and recovered to the Trustee.

95.     The Defendant Shehraze Shah has scheduled claims against FMI and Taneja in their bankruptcy cases in the amount of $220,770.71 and Khuram Shah has scheduled claims against FMI and Taneja in their bankruptcy cases in the amount of $260,467.03 (collectively, the "Defendants' Claims").

96.     Pursuant to 11 U.S.C. § 502(d), Defendants' Claims should be disallowed.

**WHEREFORE**, Plaintiff requests that an Order be entered disallowing Defendants' Claims pursuant to 11 U.S.C. § 502(d).

H. JASON GOLD, CHAPTER 11 TRUSTEE

/s/  Christopher A. Jones
WHITEFORD, TAYLOR & PRESTON L.L.P.
Bradford F. Englander (VSB# 36221)
Christopher A. Jones (VSB # 40064)
3190 Fairview Park Drive, Suite 300
Falls Church, Virginia 22042
(703) 280-9260
(703) 280-8942 (facsimile)

and

Kevin G. Hroblak (admitted *pro hac vice*)
7 St. Paul Street, Suite 1800
Baltimore, Maryland 21202
(410) 347-9405
(410) 223-4305 (facsimile)

*Special Counsel for H. Jason Gold, Chapter 11
Trustee*

### EXHIBIT 1

### Khurram & Shehraze Shah Two Year Transfers

| Debtor Transferor | Payment Type | Payment Number | Payment Date | Clear Date | Payment Amount |
|---|---|---|---|---|---|
| **Khurram Shah** | | | | | |
| NRM Investments, Inc. | Wire | 4684 | 7/5/2006 | 7/5/2006 | $    100,000.00 |
| | | | | Khurram Shah  Subtotal | 100,000.00 |
| **Specialized Loan Servicing** | | | | | |
| NRM Investments, Inc. | Check | 5813 | 6/6/2006 | 6/14/2006 | 2,003.57 |
| NRM Investments, Inc. | Check | 5812 | 6/6/2006 | 6/14/2006 | 2,127.83 |
| NRM Investments, Inc. | Elec. Debit | | 6/23/2006 | 6/23/2006 | 5,005.00 |
| NRM Investments, Inc. | Elec. Debit | | 6/23/2006 | 6/23/2006 | 5,005.00 |
| NRM Investments, Inc. | Elec. Debit | | 6/30/2006 | 6/30/2006 | 7,505.00 |
| NRM Investments, Inc. | Elec. Debit | | 6/30/2006 | 6/30/2006 | 7,505.00 |
| NRM Investments, Inc. | Check | 5896 | 8/7/2006 | 8/14/2006 | 2,003.57 |
| NRM Investments, Inc. | Check | 5897 | 8/7/2006 | 8/14/2006 | 2,127.83 |
| NRM Investments, Inc. | Check | 5939 | 8/31/2006 | 9/6/2006 | 2,127.83 |
| NRM Investments, Inc. | Check | 5938 | 8/31/2006 | 9/6/2006 | 2,003.57 |
| NRM Investments, Inc. | Check | 5972 | 10/2/2006 | 10/10/2006 | 10,000.00 |
| NRM Investments, Inc. | Check | 5971 | 10/2/2006 | 10/10/2006 | 10,000.00 |
| NRM Investments, Inc. | Check | 6019 | 11/1/2006 | 11/9/2006 | 5,000.00 |
| NRM Investments, Inc. | Check | 6020 | 11/1/2006 | 11/9/2006 | 5,000.00 |
| NRM Investments, Inc. | Check | 6080 | 12/1/2006 | 12/13/2006 | 2,003.68 |
| NRM Investments, Inc. | Check | 6081 | 12/1/2006 | 12/13/2006 | 2,203.43 |
| NRM Investments, Inc. | Check | 6139 | 1/2/2007 | 1/12/2007 | 5,000.00 |
| NRM Investments, Inc. | Check | 6140 | 1/2/2007 | 1/12/2007 | 5,000.00 |
| NRM Investments, Inc. | Check | 6189 | 2/1/2007 | 2/8/2007 | 1,660.96 |
| NRM Investments, Inc. | Check | 6188 | 2/1/2007 | 2/8/2007 | 1,907.97 |
| NRM Investments, Inc. | Check | 6253 | 3/2/2007 | 3/9/2007 | 1,907.97 |
| NRM Investments, Inc. | Check | 6254 | 3/2/2007 | 3/9/2007 | 1,660.90 |
| NRM Investments, Inc. | Check | 6321 | 4/3/2007 | 4/11/2007 | 1,660.90 |
| NRM Investments, Inc. | Check | 6320 | 4/3/2007 | 4/12/2007 | 1,907.97 |
| NRM Investments, Inc. | Check | 6392 | 5/2/2007 | 5/8/2007 | 1,907.97 |
| NRM Investments, Inc. | Check | 6393 | 5/2/2007 | 5/8/2007 | 1,660.90 |
| NRM Investments, Inc. | Check | 6449 | 6/1/2007 | 6/7/2007 | 1,660.90 |
| NRM Investments, Inc. | Check | 6448 | 6/1/2007 | 6/7/2007 | 1,907.97 |
| NRM Investments, Inc. | Check | 6500 | 6/22/2007 | 7/5/2007 | 1,660.90 |
| NRM Investments, Inc. | Check | 6499 | 6/22/2007 | 7/5/2007 | 1,907.97 |
| NRM Investments, Inc. | Check | 6580 | 8/3/2007 | 8/10/2007 | 2,660.90 |
| NRM Investments, Inc. | Check | 6579 | 8/3/2007 | 8/10/2007 | 2,907.97 |
| NRM Investments, Inc. | Check | 6648 | 9/6/2007 | 9/12/2007 | 1,660.90 |
| NRM Investments, Inc. | Check | 6647 | 9/6/2007 | 9/20/2007 | 1,907.97 |
| NRM Investments, Inc. | Check | 6701 | 10/5/2007 | 10/15/2007 | 1,660.90 |
| NRM Investments, Inc. | Check | 6700 | 10/5/2007 | 10/15/2007 | 1,907.97 |
| NRM Investments, Inc. | Check | 6746 | 11/2/2007 | 11/13/2007 | 1,907.97 |
| NRM Investments, Inc. | Check | 6747 | 11/2/2007 | 11/13/2007 | 1,660.90 |
| NRM Investments, Inc. | Check | 6803 | 12/4/2007 | 12/12/2007 | 1,660.90 |
| NRM Investments, Inc. | Check | 6788 | 12/3/2007 | 12/12/2007 | 1,963.44 |
| NRM Investments, Inc. | Check | 6853 | 1/3/2008 | 1/8/2008 | 1,870.17 |
| NRM Investments, Inc. | Elec. Debit | | 1/9/2008 | 1/9/2008 | 1,624.18 |
| NRM Investments, Inc. | Elec. Debit | | 2/11/2008 | 2/11/2008 | 1,624.18 |
| NRM Investments, Inc. | Check | 6890 | 2/5/2008 | 2/15/2008 | 1,870.17 |
| NRM Investments, Inc. | Check | 6932 | 3/5/2008 | 3/10/2008 | 1,870.17 |
| NRM Investments, Inc. | Elec. Debit | | 3/12/2008 | 3/12/2008 | 1,624.18 |
| | | | | Specialized Loan Servicing Subtotal | 133,417.46 |

**EXHIBIT 1**

**Khurram & Shehraze Shah Two Year Transfers**

| Debtor Transferor | Payment Type | Payment Number | Payment Date | Clear Date | Payment Amount |
|---|---|---|---|---|---|
| **Terwin Advisors LLC / The Winter Group** | | | | | |
| Financial Mortgage, Inc. | Wire | 2945 | 8/4/2006 | 8/14/2006 | 2,306.34 |
| Financial Mortgage, Inc. | Wire | 7227 | 8/25/2006 | 8/25/2006 | 99,000.00 |
| Financial Mortgage, Inc. | Wire | 6070 | 8/25/2006 | 8/25/2006 | 309,680.00 |
| Financial Mortgage, Inc. | Wire | 6112 | 8/25/2006 | 8/25/2006 | 304,800.00 |
| Financial Mortgage, Inc. | Wire | 5076 | 2/22/2007 | 2/22/2007 | 497,077.65 |
| Financial Mortgage, Inc. | Wire | 6036 | 4/11/2007 | 4/11/2007 | 435,675.00 |
| | | | | Terwin Advisors LLC / The Winter Group Subtotal | 1,648,538.99 |
| | | | | Total Khurram & Shehraze Shah Two Year Transfers | $  1,881,956.45 |

## EXHIBIT 2

### Khurram & Shehraze Shah Five Year Transfers

| Debtor Transferor | Payment Type | Payment Number | Payment Date | Clear Date | Payment Amount |
|---|---|---|---|---|---|
| **GMAC Bank** | | | | | |
| Financial Mortgage, Inc. | Elec. Debit | 32137316 | 12/19/2003 | 12/19/2003 | $     15,000.00 |
| Financial Mortgage, Inc. | Check | 1927 | 7/14/2005 | 7/22/2005 | 1,101.00 |
| | | | | **GMAC Bank Subtotal** | 16,101.00 |
| **Khurram Shah** | | | | | |
| NRM Investments, Inc. | Wire | 4684 | 7/5/2006 | 7/5/2006 | 100,000.00 |
| | | | | **Khurram Shah  Subtotal** | 100,000.00 |
| **Specialized Loan Servicing** | | | | | |
| Financial Mortgage, Inc. | Check | 2232 | 10/10/2005 | 10/18/2005 | 2,003.68 |
| Financial Mortgage, Inc. | Check | 2233 | 10/10/2005 | 10/19/2005 | 2,203.43 |
| Elite Entertainment, Inc. | Elec. Debit | | 10/31/2005 | 10/31/2005 | 2,008.68 |
| NRM Investments, Inc. | Elec. Debit | | 10/31/2005 | 10/31/2005 | 2,210.58 |
| Elite Entertainment, Inc. | Elec. Debit | | 11/1/2005 | 11/1/2005 | 4,906.00 |
| Elite Entertainment, Inc. | Elec. Debit | | 11/1/2005 | 11/1/2005 | 5,005.00 |
| Elite Entertainment, Inc. | Elec. Debit | | 12/14/2005 | 12/14/2005 | 3,005.68 |
| NRM Investments, Inc. | Elec. Debit | | 12/15/2005 | 12/15/2005 | 3,005.52 |
| Elite Entertainment, Inc. | Elec. Debit | | 1/12/2006 | 1/12/2006 | 4,005.00 |
| NRM Investments, Inc. | Elec. Debit | | 1/12/2006 | 1/12/2006 | 5,005.00 |
| NRM Investments, Inc. | Elec. Debit | | 2/16/2006 | 2/16/2006 | 5,005.00 |
| NRM Investments, Inc. | Elec. Debit | | 2/16/2006 | 2/16/2006 | 5,005.00 |
| NRM Investments, Inc. | Elec. Debit | | 3/13/2006 | 3/13/2006 | 5,005.00 |
| NRM Investments, Inc. | Elec. Debit | | 3/13/2006 | 3/13/2006 | 5,005.00 |
| NRM Investments, Inc. | Elec. Debit | | 4/13/2006 | 4/13/2006 | 5,005.00 |
| NRM Investments, Inc. | Elec. Debit | | 4/13/2006 | 4/13/2006 | 5,005.00 |
| NRM Investments, Inc. | Check | 5759 | 5/3/2006 | 5/25/2006 | 7,003.57 |
| NRM Investments, Inc. | Check | 5758 | 5/3/2006 | 5/25/2006 | 7,127.83 |
| NRM Investments, Inc. | Check | 5813 | 6/6/2006 | 6/14/2006 | 2,003.57 |
| NRM Investments, Inc. | Check | 5812 | 6/6/2006 | 6/14/2006 | 2,127.83 |
| NRM Investments, Inc. | Elec. Debit | | 6/23/2006 | 6/23/2006 | 5,005.00 |
| NRM Investments, Inc. | Elec. Debit | | 6/23/2006 | 6/23/2006 | 5,005.00 |
| NRM Investments, Inc. | Elec. Debit | | 6/30/2006 | 6/30/2006 | 7,505.00 |
| NRM Investments, Inc. | Elec. Debit | | 6/30/2006 | 6/30/2006 | 7,505.00 |
| NRM Investments, Inc. | Check | 5898 | 8/7/2006 | 8/14/2006 | 2,003.57 |
| NRM Investments, Inc. | Check | 5897 | 8/7/2006 | 8/14/2006 | 2,127.83 |
| NRM Investments, Inc. | Check | 5939 | 8/31/2006 | 9/6/2006 | 2,127.83 |
| NRM Investments, Inc. | Check | 5938 | 8/31/2006 | 9/6/2006 | 2,003.57 |
| NRM Investments, Inc. | Check | 5971 | 10/2/2006 | 10/10/2006 | 10,000.00 |
| NRM Investments, Inc. | Check | 5972 | 10/2/2006 | 10/10/2006 | 10,000.00 |
| NRM Investments, Inc. | Check | 6020 | 11/1/2006 | 11/9/2006 | 5,000.00 |
| NRM Investments, Inc. | Check | 6019 | 11/1/2006 | 11/9/2006 | 5,000.00 |
| NRM Investments, Inc. | Check | 6080 | 12/1/2006 | 12/13/2006 | 2,003.68 |
| NRM Investments, Inc. | Check | 6081 | 12/1/2006 | 12/13/2006 | 2,203.43 |
| NRM Investments, Inc. | Check | 6139 | 1/2/2007 | 1/12/2007 | 5,000.00 |
| NRM Investments, Inc. | Check | 6140 | 1/2/2007 | 1/12/2007 | 5,000.00 |
| NRM Investments, Inc. | Check | 6188 | 2/1/2007 | 2/8/2007 | 1,907.97 |
| NRM Investments, Inc. | Check | 6189 | 2/1/2007 | 2/8/2007 | 1,660.96 |
| NRM Investments, Inc. | Check | 6253 | 3/2/2007 | 3/9/2007 | 1,907.97 |
| NRM Investments, Inc. | Check | 6254 | 3/2/2007 | 3/9/2007 | 1,660.90 |
| NRM Investments, Inc. | Check | 6321 | 4/3/2007 | 4/11/2007 | 1,660.90 |
| NRM Investments, Inc. | Check | 6320 | 4/3/2007 | 4/12/2007 | 1,907.97 |
| NRM Investments, Inc. | Check | 6393 | 5/2/2007 | 5/8/2007 | 1,660.90 |

**EXHIBIT 2**

**Khurram & Shehraze Shah Five Year Transfers**

| Debtor Transferor | Payment Type | Payment Number | Payment Date | Clear Date | Payment Amount |
|---|---|---|---|---|---|
| NRM Investments, Inc. | Check | 6392 | 5/2/2007 | 5/8/2007 | 1,907.97 |
| NRM Investments, Inc. | Check | 6448 | 6/1/2007 | 6/7/2007 | 1,907.97 |
| NRM Investments, Inc. | Check | 6449 | 6/1/2007 | 6/7/2007 | 1,660.90 |
| NRM Investments, Inc. | Check | 6500 | 6/22/2007 | 7/5/2007 | 1,660.90 |
| NRM Investments, Inc. | Check | 6499 | 6/22/2007 | 7/5/2007 | 1,907.97 |
| NRM Investments, Inc. | Check | 6579 | 8/3/2007 | 8/10/2007 | 2,907.97 |
| NRM Investments, Inc. | Check | 6580 | 8/3/2007 | 8/10/2007 | 2,660.90 |
| NRM Investments, Inc. | Check | 6648 | 9/6/2007 | 9/12/2007 | 1,660.90 |
| NRM Investments, Inc. | Check | 6847 | 9/6/2007 | 9/20/2007 | 1,907.97 |
| NRM Investments, Inc. | Check | 6700 | 10/5/2007 | 10/15/2007 | 1,907.97 |
| NRM Investments, Inc. | Check | 6701 | 10/5/2007 | 10/15/2007 | 1,660.90 |
| NRM Investments, Inc. | Check | 6747 | 11/2/2007 | 11/13/2007 | 1,660.90 |
| NRM Investments, Inc. | Check | 6746 | 11/2/2007 | 11/13/2007 | 1,907.97 |
| NRM Investments, Inc. | Check | 6803 | 12/4/2007 | 12/12/2007 | 1,660.90 |
| NRM Investments, Inc. | Check | 6788 | 12/3/2007 | 12/12/2007 | 1,963.44 |
| NRM Investments, Inc. | Check | 6853 | 1/3/2008 | 1/8/2008 | 1,870.17 |
| NRM Investments, Inc. | Elec. Debit | | 1/9/2008 | 1/9/2008 | 1,624.18 |
| NRM Investments, Inc. | Elec. Debit | | 2/11/2008 | 2/11/2008 | 1,624.18 |
| NRM Investments, Inc. | Check | 6890 | 2/5/2008 | 2/15/2008 | 1,870.17 |
| NRM Investments, Inc. | Check | 6932 | 3/5/2008 | 3/10/2008 | 1,870.17 |
| NRM Investments, Inc. | Elec. Debit | | 3/12/2008 | 3/12/2008 | 1,624.18 |
| | | | **Specialized Loan Servicing Subtotal** | | 210,937.43 |
| **Terwin Advisors LLC / The Winter Group** | | | | | |
| Financial Mortgage, Inc. | Wire | 1923 | 8/26/2005 | 8/26/2005 | 38,290.00 |
| Financial Mortgage, Inc. | Wire | 1976 | 8/26/2005 | 8/26/2005 | 33,390.00 |
| Financial Mortgage, Inc. | Wire | 2945 | 8/4/2006 | 8/14/2006 | 2,306.34 |
| Financial Mortgage, Inc. | Wire | 7227 | 8/25/2006 | 8/25/2006 | 99,000.00 |
| Financial Mortgage, Inc. | Wire | 6070 | 8/25/2006 | 8/25/2006 | 309,680.00 |
| Financial Mortgage, Inc. | Wire | 6112 | 8/25/2006 | 8/25/2006 | 304,800.00 |
| Financial Mortgage, Inc. | Wire | 5076 | 2/22/2007 | 2/22/2007 | 497,077.65 |
| Financial Mortgage, Inc. | Wire | 6036 | 4/11/2007 | 4/11/2007 | 435,675.00 |
| | | | **Terwin Advisors LLC / The Winter Group Subtotal** | | 1,720,218.99 |
| | | | **Total Khurram & Shehraze Shah Five Year Transfers** | **$** | **2,047,257.42** |

**EXHIBIT 3**

**Khurram & Shehraze Shah Ninety Day Transfers**

| Debtor Transferor | Payment Type | Payment Number | Payment Date | Clear Date | Payment Amount |
|---|---|---|---|---|---|
| **Specialized Loan Servicing** | | | | | |
| NRM Investments, Inc. | Check | 6932 | 3/5/2008 | 3/10/2008 | $ 1,870.17 |
| NRM Investments, Inc. | Elec. Debit | | 3/12/2008 | 3/12/2008 | 1,624.18 |
| | | | Total Khurram & Shehraze Shah Ninety Day Transfers | | $ 3,494.35 |